In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1116

GAIL STOCKTON, individually and as Special Administrator of the ESTATE OF MICHAEL MADDEN, deceased,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE COUNTY, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-758 — **Lynn Adelman**, *Judge.*

———————————

ARGUED MAY 31, 2022 — DECIDED AUGUST 9, 2022

———————————

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

ST. EVE, *Circuit Judge.* When Michael Madden arrived at the Milwaukee County Jail on an outstanding probation violation, he suffered from various ailments, including a history of intravenous drug abuse and a congenital heart defect. Over the course of a month, Madden developed infective endocarditis, a serious and occasionally fatal heart infection. Although medical staff treated Madden repeatedly for numerous

complaints during this period, none diagnosed the infective endocarditis. By the end of the month, Madden was dead. Gail Stockton, the special administrator of Madden's estate, filed suit asserting deliberate indifference, use of excessive force, *Monell* liability, and state law claims against the state actors involved with Madden's care. The district court dismissed all of Stockton's claims at summary judgment. We affirm in part and reverse and remand in part.

## I. Background

### A. Consent Decree and Monitoring

On March 7, 2001, Milwaukee County entered into a consent decree (the "Consent Decree") regarding conditions in the Milwaukee County Jail ("MCJ"). Among the conditions subject to the Consent Decree are the health services provided at the MCJ, including medical staffing levels and processing of inmate requests for medical attention, known as sick call slips. Dr. Ronald Shansky, a correctional healthcare expert, has monitored the MCJ's compliance with the Consent Decree and generated biannual reports since 2001.

Milwaukee County contracted with Armor Correctional Health Service, Inc. ("Armor") to provide healthcare services to MCJ inmates. The Shansky reports indicate Armor consistently struggled to meet medical staffing level expectations and process sick call slips in a timely manner. David Clarke, the Milwaukee County Sheriff during the relevant period, oversaw the MCJ and tasked Richard Schmidt, an Inspector with the Milwaukee County Sheriff's Office, with the responsibility of overseeing Armor. Nancy Evans, the Jail Commander, was responsible for the day-to-day operations in the MCJ.

### B. Madden's Confinement

Michael Madden was booked into the MCJ on a warrant for an outstanding probation violation on September 29, 2016. During intake, Madden disclosed both a history of intravenous drug use and a congenital heart defect. These characteristics placed him at risk of developing infective endocarditis, a serious and potentially lethal heart infection. Infective endocarditis typically presents with a new heart murmur, shortness of breath, and elevated temperature. Due to Madden's drug use on the day of his arrest, the MCJ placed him on heroin withdrawal protocol for six days.

On October 5, 2016, Mercy Mahaga, a nurse practitioner employed by Armor, evaluated Madden in response to a sick call. Madden reported taking unprescribed benzodiazepine while in the MCJ and a history of heroin use. Madden's blood pressure was 101/60, his heartrate was elevated at 101 beats per minute ("BPM"), and his respiration was 18 breaths per minute ("bPM"). Mahaga noted Madden's lungs sounded normal and he appeared alert and oriented. Mahaga determined Madden was likely suffering "benzo withdrawal" and instructed him to stop using drugs and to drink more fluids.

Madden requested an emergency medical evaluation on October 11, 2016, for "heart issues" and "trouble breathing." Madden reported he was "not drinking virtually any water," experienced "dizziness when standing," and informed the nurse evaluating him of his congenital heart defect. Madden's blood pressure was 108/53, his heartrate was 106 BPM, his respiration was 18 bPM, and his temperature was 97.9°F. Madden was transferred to the MCJ clinic and placed on intravenous fluids, after which he reported feeling "much better."

Madden sought emergency medical attention once again on October 13, 2016, because his "heart hurt[]." CaryAnne Adriano, a registered nursing supervisor employed by Armor, evaluated Madden. Madden reported suffering diarrhea due to benzodiazepine and heroin withdrawal, that he was not drinking water, and a history of gastroesophageal reflux disease ("GERD"). GERD may cause chest pain, even severe chest pain. During this evaluation, Madden's blood pressure was 114/62, his heartrate was elevated at 112 BPM, his respiratory rate was 20 bPM, his temperature was slightly elevated at 100.3°F, his heart rhythm was normal, and he displayed no other signs of distress. Adriano instructed Madden to take Tums and Kaolin-Pectin and to increase his fluid intake. She also scheduled him for a follow-up assessment the next day. Adriano testified she was not concerned Madden might be suffering a heart condition because his symptoms were consistent with suffering narcotics withdrawal and failure to eat and drink appropriately.

Mahaga performed Madden's follow-up the next day. During this appointment, Madden complained of watery diarrhea, inability to sleep, and dissatisfaction with the jail diet. Mahaga reviewed Adriano's notes from the previous day. Mahaga did not understand the "cp" notation as shorthand for "chest pain," did not take steps to determine what "cp" meant, and did not know Madden previously complained of chest pain. Madden appeared alert, oriented, and not in distress during the follow-up. Madden's blood pressure was 98/62, his heartrate was an elevated 108 BPM, his temperature was 97.1°F, and his respiratory rate was 17 bPM. Madden weighed 142 pounds on October 14, 2016, constituting a seven-pound loss since his intake on September 29, 2016. Mahaga also noticed a low-grade heart murmur she did not hear

on October 5, 2016. The murmur was faint enough Mahaga did not consider it an emergency. Mahaga knew murmurs could be caused by infections or by insufficient fluid intake and that Madden had a congenital heart defect, was an intravenous drug user, exhibited persistently elevated heartrates, had a low-grade fever the previous day, and had not been drinking sufficient fluids for a sustained period of time. Mahaga also knew intravenous drug users were at a heightened risk of infections and that infections could prove lethal. At the time, she understood the symptoms of infective endocarditis and that diagnosing infective endocarditis required blood testing and an electrocardiogram. Ultimately, Mahaga determined Madden suffered "diarrhea" and instructed him to drink more fluids.

On October 25, 2016, a sick call slip was entered for Madden in which he reported:

> I have severe allergies and have been experiences [*sic*] bad symptoms. I've had prescriptions, but are too old. Would it be possible to get an antihistamine or some medication to alleviate symptoms. Thank you.

Madden's sick call slip was assigned the highest priority level and scheduled for a follow-up on October 26, 2016. Madden was not seen by medical staff on October 26, 2016, however. Stockton's expert, nurse Lori Roscoe, attributed this failure to MCJ's inadequate medical staffing levels.

At approximately 1:00 a.m. on October 28, 2016, Adriano, nurse Bonnie Litrenta, correctional officer Tinita Holmes, correctional officer Brian Piasecki, and correctional lieutenant Jeffrey Andrykowski responded to a medical emergency in

Madden's cell. Madden was hyperventilating, complained of chest pain, exhibited difficulty breathing, and was having trouble standing and walking. Adriano and Litrenta heard Madden say he had a heart condition. Piasecki grabbed Madden by the shirt, pushed him into a chair, and yelled at him to "sit the fuck up." While in the chair, Madden vomited an orange substance. Adriano and Litrenta instructed Andrykowski to bring Madden to the medical clinic for additional treatment. The nurses did not give the correctional staff specific instructions for Madden's care during transport.

The correctional staff called for a wheelchair and attempted to move Madden closer to the cell exit while awaiting its arrival. Madden could not walk and fell to the ground, at which point Piasecki swore at him to get up, lifted him, and pulled him towards the cell exit. Piasecki propped Madden against the wall, but Madden slipped and hit his head. Piasecki repositioned Madden so he was braced on Piasecki's legs. Litrenta testified Piasecki then deliberately moved his legs so Madden fell and hit his head on the floor.

At this point, Adriano, Holmes, and Litrenta left the cell and returned to the MCJ clinic. The parties dispute whether the nurses left of their own volition or whether Andrykowski ordered them to leave. Once the wheelchair arrived, the correctional officers put Madden in the wheelchair and transported him to the MCJ clinic on an elevator. Video footage of the elevator trip, lasting approximately 40 seconds, shows Madden fully unconscious and limp but does not reveal whether Madden had a pulse or was breathing. MCJ policy dictates that if a correctional officer comes across someone who seems unresponsive, he is to tap and shout at the individual. If the individual does not react, correctional officers

should then check for signs of life such as breathing, a pulse, or chest movement. If there are no signs of life, the correctional officer should initiate CPR and radio for medical assistance. Piasecki and Andrykowski did not conduct the "tap and shout" procedure on Madden in the elevator but testified they believed he was breathing. While in the elevator, Piasecki used a flashlight to check Madden's pupils. None of the correctional staff checked Madden's pulse or performed CPR in the elevator.

By Adriano and Litrenta's estimation, Madden arrived at the MCJ clinic between two and five minutes after they left his cell. Adriano noticed Madden was not breathing shortly after he arrived at the MCJ clinic and instructed correctional staff to place him on a table and administer CPR. Madden was declared dead shortly thereafter from what the medical examiner concluded to be infective endocarditis. The parties agree the latest possible date on which medical intervention could have prevented Madden's death from infective endocarditis was October 27, 2016. Stockton has not offered any evidence that Madden's death could have been prevented after the medical emergency began on October 28, 2016.

## C. Procedural History

Stockton, as special administrator of Madden's estate, filed suit naming Milwaukee County, Clarke, Schmidt, Piasecki, Armor, Mahaga, Evans, Andrykowski, and Adriano as defendants (collectively, "Appellees").[1] Stockton asserts several causes of action under 42 U.S.C. § 1983: deliberate

---

[1] Litrenta, initially a named defendant, was dismissed pursuant to a settlement agreement on November 2, 2020, and is no longer party to this suit.

indifference in violation of the Eighth and Fourteenth Amendments against Milwaukee County, Clarke, Schmidt, Evans, and Armor (Count I), Mahaga and Adriano (Count II), and Andrykowski (Count IV); and excessive force in violation of the Eighth and Fourteenth Amendments against Piasecki (Count III).[2]

The district court granted Appellees' subsequent motion for summary judgment on all causes of action. Stockton's deliberate indifference claim against Mahaga failed because there was no evidence Mahaga subjectively concluded Madden was at risk of infective endocarditis. The deliberate indifference claims against Adriano and Andrykowski failed because the parties agree the last opportunity for medical intervention was October 27, 2016, predating the actions of Adriano and Andrykowski to which Stockton objects. Although the district court acknowledged Stockton identified "a number of customs or practices which may have contributed to the failure to diagnose Madden's infective endocarditis," it nonetheless held Milwaukee County and Armor were not subject to *Monell* liability because Stockton failed to "identify an underlying constitutional violation." None of the deliberate indifference claims survived a summary judgment challenge, and the district court concluded it was "entirely speculative" that, had medical personnel responded to Madden's October 25, 2016, sick call slip, they would have diagnosed him with infective endocarditis. The absence of an underlying constitutional violation likewise doomed Stockton's supervisory liability claims against Clarke, Schmidt, and Evans. As to Stockton's excessive force claim against Piasecki, the district court

---

[2] Stockton also raised three causes of action for violations of Wisconsin state law (Counts V–VII), but these are not pertinent to the present appeal.

held Stockton presented sufficient evidence for a reasonable jury to find excessive force, but that Piasecki was shielded by qualified immunity. Finally, as none of Stockton's federal claims survived summary judgment, the district court declined to exercise supplemental jurisdiction over the remaining state-law claims.

Stockton timely appealed the district court's summary judgment ruling.

## II. Discussion

Stockton challenges virtually all aspects of the district court's summary judgment ruling on appeal. First, Stockton claims she provided sufficient evidence to create triable issues of fact as to whether Mahaga, Adriano, and Andrykowski were deliberately indifferent. Second, Stockton argues a jury could reasonably conclude from this record that Milwaukee County and Armor are subject to *Monell* liability and that Clarke, Schmidt, and Evans are subject to supervisory liability. Third, Stockton maintains Piasecki is not entitled to qualified immunity for his use of excessive force against Madden.

We review a district court's summary judgment ruling de novo, giving the non-moving party the benefit of conflicting evidence and reasonable inferences. *Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols.*, 8 F.4th 642, 647 (7th Cir. 2021). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties genuinely dispute a material fact where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (internal quotations omitted); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge. *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## A. Deliberate Indifference

The Eighth Amendment proscribes "deliberate indifference to serious medical needs of prisoners" amounting to "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up); *see also Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021). In order to maintain a deliberate indifference claim, Stockton must point to evidence that (1) Madden suffered an objectively serious medical condition; (2) the defendant in question knew of the condition and was deliberately indifferent to treating Madden; and (3) this deliberate indifference injured Madden.[3] *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *see also*

---

[3] Until oral argument, both parties apparently presumed the Eighth Amendment provided the proper standard for evaluating Stockton's deliberate indifference claim. We are not so certain. In *Miranda v. County of Lake*, we held the standard for pretrial detainees challenging their medical care under the Fourteenth Amendment is lower than that for post-conviction prisoners proceeding under the Eighth Amendment. 900 F.3d 335, 350–54 (7th Cir. 2018); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (holding that pretrial detainees bringing claims under the Fourteenth Amendment need only show that the defendant's conduct was objectively unreasonable); *Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019). It is not entirely clear whether Madden—incarcerated at the MCJ on an unadjudicated probation violation—fits within the Eighth Amendment or the Fourteenth Amendment framework. We need not resolve this issue, however, as Stockton failed to advocate for Fourteenth Amendment treatment, thereby waiving the question. *See United States v. Mezzanatto*, 513

*Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). Appellees do not dispute that infective endocarditis constitutes an objectively serious medical condition. The parties disagree whether the record contains adequate evidence to satisfy the second and third elements of deliberate indifference.

To establish a given defendant's knowledge, Stockton must demonstrate each defendant subjectively knew of Madden's risk of infective endocarditis and nonetheless disregarded that risk. *Gayton*, 593 F.3d at 620. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (cleaned up); *see also Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Whether a given defendant subjectively knew of such a risk is a question of fact which may be demonstrated by "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Zaya*, 836 F.3d at 805 (internal quotations omitted).

Deliberate indifference occupies a space slightly below intent and poses a "high hurdle and an exacting standard" requiring "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald*, 982 F.3d at 458 (cleaned up). Negligence, or even objective recklessness, is insufficient to satisfy deliberate indifference. *Petties*, 836 F.3d at 728. Whether a defendant was deliberately

---

U.S. 196, 201 (1995) (reiterating constitutional rights are waivable); *United States v. Morgan*, 929 F.3d 411, 424 (7th Cir. 2019). For purposes of this appeal, we assume without concluding the Eighth Amendment applies.

indifferent to a known risk of harm is also a question of fact. *Gayton*, 593 F.3d at 620.

Finally, the causal link between a defendant's deliberate indifference and a plaintiff's injury is typically a question reserved for the jury. *Id*. at 624. Where a plaintiff offers sufficient evidence from which a reasonable jury could infer delayed treatment harmed an inmate, summary judgment on the issue of causation is rarely appropriate. *Id*. at 624–25. Summary judgment on causation is nonetheless warranted where "a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury." *Id*. at 624.

### 1. Nurse Mahaga

According to Stockton, Mahaga's failure to diagnose Madden with infective endocarditis on October 14, 2016, constituted deliberate indifference. It is certainly true that, on October 14, 2016, Mahaga knew information about Madden from which she might have inferred he was at risk of infective endocarditis. Mahaga knew Madden was an intravenous drug user going through withdrawal; had a congenital heart defect; exhibited a persistently elevated heartrate; presented a new, low-grade heart murmur; lost seven pounds in the span of two weeks; and suffered a fever the day before. Mahaga was also familiar with the symptoms of, and risk factors associated with, infective endocarditis. There is no record evidence, however, that Mahaga in fact concluded Madden was at serious risk of infective endocarditis, as is required to find deliberate indifference. *See Zaya*, 836 F.3d at 804. Indeed, according to her notes, Mahaga assessed Madden suffered diarrhea related to his withdrawal and instructed him to increase his fluid intake.

Nor was Mahaga's conclusion unreasonable given the circumstances. The fundamental hurdle Stockton fails to surmount is that Madden apparently suffered an array of ailments in addition to infective endocarditis, each of which plausibly accounted for his symptoms. Mahaga knew Madden was suffering opioid withdrawal, was not drinking adequate fluids, suffered persistent diarrhea, and was not eating properly. It is undisputed that dehydration may cause elevated heartrate as well as a heart murmur. Madden's failure to eat and drink properly during his time at the MCJ could also explain his seven-pound weight loss during this period. Moreover, even if Mahaga knew Madden complained of chest pain during his October 13, 2016, exam with Adriano, Mahaga knew Madden suffered GERD, which can also cause severe chest pain. Evidence that a defendant's course of treatment was consistent with other ailments may prove fatal to a deliberate indifference claim. *See Donald*, 982 F.3d at 459–60.

Presented with these facts, we cannot conclude Mahaga's failure to rule out infective endocarditis amounted to "such a substantial departure from accepted professional judgment, practice, or standards" as to allow a reasonable jury to find deliberate indifference. *Gayton*, 593 F.3d at 623 (internal quotations omitted). Unless "no minimally competent professional" would have treated Madden as Mahaga did, her medical decisions are entitled to deference. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Mistakes in medical judgment, even negligence, are insufficient to support deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Although Mahaga might have gone to greater lengths to conclusively rule out infective endocarditis (such as requesting diagnostic blood work and an electrocardiogram), her "decision to forego diagnostic tests is 'a classic

example of a matter for medical judgment'" entitled to deference. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Estelle*, 429 U.S. at 107). Evidence from Stockton's expert and Mahaga's supervisor that, to meet the standard of care, a nurse in Mahaga's position would be expected to incorporate infective endocarditis as a differential diagnosis under the circumstances is similarly unavailing. All the available evidence indicates Mahaga honestly believed in the diagnosis she rendered. *Zaya*, 836 F.3d at 805 (citing the presence of such evidence as a basis to deny summary judgment). "[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729 (emphasis in original).

Although Mahaga apparently misdiagnosed Madden, there is no evidence she "acted with the requisite culpable state of mind," *Gayton*, 593 F.3d at 620 (internal quotations omitted), to meet deliberate indifference's "high hurdle and exacting standard," *Donald*, 982 F.3d at 458 (cleaned up). The district court properly awarded summary judgment in Mahaga's favor.

### 2. Nurse Adriano and Lieutenant Andrykowski

Stockton's deliberate indifference claims against Adriano and Andrykowski turn entirely upon the defendants' actions on October 28, 2016. Specifically, Stockton points to Adriano's decision to leave Madden's cell before he was transported to the MCJ clinic and Andrykowski's failure to render CPR in the elevator as constituting deliberate indifference. Both parties agree the last possible opportunity for medical intervention to save Madden's life passed on October 27, 2016, so there is no evidence either Adriano's or Andrykowski's actions in the early hours of October 28, 2016, contributed to Madden's

death. Nor does the record contain any evidence Adriano or Andrykowski caused Madden additional pain or suffering. This is one of those "rare instance[s]" in which summary judgment based on causation is appropriate. *Gayton*, 593 F.3d at 624.

### 3. *Monell* Liability

Under *Monell v. Department of Social Services*, local governments—and private corporations acting under color of state law—are liable for constitutional torts arising from their policies or customs. 436 U.S. 658, 690 (1978); *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–96 (7th Cir. 2014). *Monell* liability is rare and difficult to establish. *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022). Municipalities, however, are not vicariously liable for the constitutional torts of their employees or agents. *Monell*, 436 U.S. at 691–94. Instead, a municipality is liable under § 1983 only "for its own violations of the federal Constitution and laws." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021); *see also Monell*, 436 U.S. at 694.

For *Monell* liability to attach, Stockton must first trace the deprivation of a federal right to some municipal action. *Dean*, 18 F.4th at 235; *LaPorta*, 988 F.3d at 986. Municipal action giving rise to § 1983 liability may take the form of: (1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority. *Dean*, 18 F.4th at 235; *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Second, Stockton must show the municipal action amounts to deliberate indifference, a high hurdle to clear. *Dean*, 18 F.4th at 235; *Thomas*, 604 F.3d at 303. Third and finally, Stockton must provide evidence that the municipal action was the "moving force" behind Madden's constitutional

injury, a "rigorous" causation standard demanding a "direct causal link between the challenged municipal action and the violation of [Madden's] constitutional rights." *Dean*, 18 F.4th at 235 (internal quotations omitted); *see also Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016). Stockton fails to present evidence creating a triable issue of fact as to either deliberate indifference or moving force causation.

Stockton posits Armor and Milwaukee County's failure to maintain adequate medical staffing levels and process sick call slips amounted to a widespread practice that caused MCJ medical providers to neglect to respond to Madden's October 25, 2016 sick call slip, thus depriving him of constitutionally adequate medical care. To establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, Stockton must point to other inmates injured by that practice. *See Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) ("*Monell* claims based on allegations of an unconstitutional municipal practice or custom … normally require evidence that the identified practice or custom caused multiple injuries."); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Absent multiple injuries, Stockton cannot supply adequate evidence from which a jury could reasonably find Armor and Milwaukee County would "'conclude that the plainly obvious consequences'" of the practice "would result in the deprivation of a federally protected right," as is required to establish deliberate indifference. *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)).

Stockton does not point to evidence that other inmates were similarly harmed and leans, instead, upon Madden's

single, isolated experience. Here, Stockton relies almost exclusively upon the Shansky reports. The parties dispute the propriety of relying upon these reports. Although the district court did not rule upon their admissibility, we have repeatedly held such reports are inadmissible hearsay and thus their contents cannot be offered for the truth of the matter asserted. Fed. R. Evid. 801, 802; *see Dean*, 18 F.4th at 232; *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019); *Daniel*, 833 F.3d at 743. Consequently, we cannot look to the Shansky reports as evidence for the truth of what happened to other inmates. Moreover, even were the Shansky reports fully admissible for the truth of the matter asserted (a finding we do not make here), they still do not adequately support a claim for *Monell* liability. True, the Shansky reports portray the MCJ as persistently struggling to maintain adequate medical staffing levels and appropriately respond to inmate sick call slips. Yet the Shansky reports do not connect this purported municipal practice to any inmate injury.

The Shansky reports document three deaths between May 2016 and November 2016. Although Shansky notes inadequate medical staffing levels during this period, he does not attribute any of these deaths, or any serious medical injury, to problems with medical staffing or sick call slip processing. Shansky opined an inmate's April 24, 2016, death from dehydration was due to an initial screening error by the intake nurse and inadequate officer staffing and oversight—notably, not inadequate medical staffing—at the MCJ. When a pregnant inmate's child died shortly after birth the morning of July 14, 2016, Shansky opined "given the shortage of officers it is not clear how thorough the monitoring was." While Shansky mentions officer staffing levels (again, not medical staffing levels), he does not go so far as to attribute the injury to

inadequate monitoring or inadequate medical staffing. Instead, Shansky suggests the MCJ erred in transferring the pregnant inmate among units without providing for proper coordination. Finally, Shansky attributes the August 28, 2016, death of an inmate with a history of drug use to a policy failure and recommended all inmates, regardless of any recent admission to the MCJ, receive a new assessment upon intake. Again, Shasky does not connect this inmate's injury to medical staffing levels or to sick call processing.

Nor has Stockton identified evidence that medical staffing levels or sick call slip processing caused Madden to receive constitutionally inadequate medical care. Consequently, Stockton's claim for *Monell* liability fails to establish moving force causation. *See Daniel*, 833 F.3d at 736. A sick call slip was entered on Madden's behalf on October 25, 2016, in which Madden complained of "bad symptoms" from "severe allergies" and requested new antihistamines. The MCJ designated the sick call slip high priority and scheduled Madden for a follow up on October 26, 2016. MCJ medical staff did not follow up with or see Madden, however, until his death in the early hours of October 28, 2016. Stockton points to some evidence inadequate medical staffing at the MCJ may have caused this lapse. But Stockton does not present evidence that Madden would have been diagnosed with infective endocarditis or received lifesaving treatment had MCJ medical staff seen him between October 26, 2016, and October 28, 2016, based upon his complaint about his allergies. The testimony of Stockton's expert that "[i]t is [ ] probable that … signs of [infective endocarditis] would have been present and led to further medical evaluation and treatment with ultimate admission to the hospital" during this period is entirely speculative and does not create a genuine issue of fact. The sole

evidence of Madden's symptoms at the time is the sick call slip itself. We are not convinced a jury could reasonably conclude a timely response by MCJ medical staff to Madden's allergy complaint would have led to the correct diagnosis or treatment for infective endocarditis.

In sum, Stockton failed to offer evidence sufficient to establish either deliberate indifference or moving force causation. Stockton's evidence linking Madden's unfortunate death to a municipal practice or custom is tenuous and highly speculative. Additionally, there is no evidence other MCJ inmates were constitutionally harmed by inadequate medical staffing or sick call slip processing. The district court properly dismissed Stockton's claim for *Monell* liability against Armor and Milwaukee County.

### 4. Supervisory Liability

Stockton attempts to hold Clarke, Schmidt, and Evans liable as supervisors for their role in allowing Armor and Milwaukee County to maintain an unconstitutional widespread custom or practice in the MCJ. In order for supervisory liability to attach under § 1983, Stockton must offer evidence of, among other things, a constitutional deprivation. *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). As discussed thoroughly above in Section II.A.3, Stockton failed to produce evidence of a widespread custom or practice resulting in a deprivation of Madden's constitutional rights.

Moreover, supervisory liability cannot attach under § 1983 absent a showing the officer is personally responsible for a deprivation of a constitutional right. *Id*. To maintain an action for supervisory liability against Clarke, Schmidt, or Evans, Stockton cannot rely on a theory of respondeat superior but,

instead, must present evidence that the defendants violated the Constitution through their own conduct. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Stockton must demonstrate Madden's injury occurred at Clarke, Schmidt, and Evans's direction or with their knowledge and consent and that the defendants acted "either knowingly or with deliberate, reckless indifference." *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011) (internal quotations omitted); *see also Williams*, 927 F.3d at 482. On this record, no reasonable jury could conclude Clarke, Schmidt, or Evans were personally involved either in Madden's care or facilitated, approved, or turned a blind eye to medical staffing levels or sick call slip processing at the MCJ. The district court properly awarded summary judgment in Clarke, Schmidt, and Evans's favor.

**B. Use of Excessive Force**

The Eighth Amendment prohibits "the 'unnecessary and wanton infliction of pain' on prisoners." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). For excessive force claims, we examine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. To evaluate this question, we weigh several factors, such as "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). A *de minimus* application of force is insufficient to support an Eighth Amendment excessive force claim; instead, the force must be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327

(1986)). Additionally, to survive summary judgment, Stockton must present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

Relevant to the present appeal, the district court held Stockton submitted sufficient evidence from which a reasonable jury could conclude Piasecki used excessive force in violation of the Eighth Amendment when he purposefully moved his legs and allowed Madden to fall and hit his head on the floor. We agree. Piasecki knew Madden was incapable of supporting himself. Madden had already fallen twice before Piasecki braced him against his legs: once when attempting to walk to the entrance of the cell and again when he was propped against the cell wall. Piasecki even yelled at Madden to "sit the fuck up" when Madden was slumped in a chair. Litrenta and Adriano both testified they believed Piasecki moved his legs deliberately. Litrenta further believed Piasecki did so intending Madden to fall, a position she reiterated multiple times during her deposition. A jury could reasonably conclude Piasecki purposely allowed Madden to fall and hit his head. Nor is Piasecki's use of force under these particular circumstances—offering and then removing support from a uniquely vulnerable inmate—*de minimus*. Although Piasecki did not strike or hit Madden, viewing the evidence in the light most favorable to Stockton, there is an issue of fact as to whether this use of force is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10 (quoting *Whitley*, 475 U.S. at 327). Moreover, Adriano and Litrenta both heard a loud thud when Madden hit his head "very hard" on the floor. Finally, Piasecki swore and shouted at Madden throughout the duration of the encounter. A jury could reasonably conclude Piasecki maliciously allowed Madden to fall, intending to cause him harm.

We part ways with the district court as to whether Piasecki is entitled to qualified immunity. Qualified immunity shields state actors from liability where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotations omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine consists of two related inquiries, which courts may address in either order. We ask whether Piasecki "violated a statutory or constitutional right." *Reed*, 906 F.3d at 546 (internal quotations omitted). As discussed above, a reasonable jury could conclude Piasecki—by deliberately causing Madden to fall and hit his head—violated Madden's Eighth Amendment right to be free of excessive force. We also examine whether the violated right was "clearly established" at the time the challenged conduct occurred. *Id*. A right is clearly established where it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). Here, we look to the "specific context of the case," not to "broad general proposition[s]." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds by Pearson*, 555 U.S. 223. Stockton bears the burden of defeating Piasecki's claim to qualified immunity. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

Stockton may demonstrate a right is "clearly established" in three ways. First, by identifying a "closely analogous case finding the alleged violation unlawful." *Reed*, 906 F.3d at 547 (internal quotations omitted). Second, by identifying in the relevant caselaw "such a clear trend … that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id*. (internal

quotations omitted). These first two avenues are not at issue here. Stockton does not identify, and we cannot find, a closely analogous case or such a clear trend. Stockton relies instead upon the third option, reserved for "rare cases," arguing Piasecki's conduct was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Id*. (cleaned up); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

This is one of those rare cases. Piasecki encountered Madden in clear and debilitating medical distress. Madden was hyperventilating, experiencing difficulty breathing, and complained of severe chest pain. He could not walk, stand, or support himself; was crawling on the floor of his cell dry heaving; could not move about his cell without being physically dragged by the officers; and vomited an orange substance. Madden proved unable to sit in a chair or remain upright when propped against a wall. Piasecki witnessed Madden fall several times, at least once striking his head on the wall of his cell. Piasecki volunteered to act as Madden's physical support, bracing the man on his legs. Then, two witnesses watched Piasecki "purposefully [take] a step backward" and, according to Litrenta, "allow[] Madden to fall back and smack the back of his head on the cement" floor "very hard." Viewing the evidence in the light most favorable to Stockton, Piasecki deliberately caused Madden to fall and hit his head. It strains credulity to imagine Piasecki, or any reasonable officer in his position confronted with these particular circumstances, could possibly think he acted lawfully by intentionally causing Madden to hit his head. A reasonable jury could find Piasecki was on notice his conduct amounted to a "gratuitous infliction of wanton and unnecessary pain" prohibited

by the Eighth Amendment. *Hope*, 536 U.S. at 738 (internal quotations omitted); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam). The district court erred in awarding Piasecki summary judgment based on qualified immunity.[4]

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED as to Counts I, II, and IV. The judgment of the district court is REVERSED and REMANDED as to Count III.

---

[4] After dismissing Stockton's federal claims, the district court declined to exercise supplemental jurisdiction over Stockton's state law claims. As we reinstate Stockton's use of excessive force claim under § 1983, the district court should revisit the question of supplemental jurisdiction on remand. *See Brunson v. Murray*, 843 F.3d 698, 715 (7th Cir. 2016).